Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Ryan Goldberg (RG 7570)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance*
*Co., GEICO Indemnity Co., GEICO General Insurance*
*Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY CO.,

Docket No.:

                           Plaintiffs,

              -against-

NODARI MIKELASHVILI, M.D.,
AYOOB KHODADADI, M.D.,

           -and-

ADVANCED MEDICAL DIAGNOSTICS OF QUEENS, P.C.,
SPRINGFIELD RADIOLOGY IMAGING, P.C.,

           -and-

DIMITRY TVILDIANI A/KA DIMITRY TVILDIANA,
IBERIA MANAGEMENT, LLC,
MEDEQ INTERNATIONAL, LLC,
JOHN DOE DEFENDANTS 1 – 10, and
JOHN DOE CORPORATIONS 1 – 10.

                     Defendants.

------------------------------------------------------------------X

**Plaintiffs Demand a
Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $620,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent charges for radiology services that allegedly were rendered to individuals involved in automobile accidents and eligible for coverage under policies of automobile insurance that were issued by GEICO ("Insureds").  Defendants perpetrated their fraud through a scheme involving two physicians, Nodari Mikhelashvili, M.D. ("Dr. Mikhelashvili") and Ayoob Khodadadi, M.D. ("Dr. Khodadadi"), two medical professional corporations known as Advanced Medical Diagnostics of Queens, P.C. ("AMD") and Springfield Radiology Imaging, PC ("Springfield Imaging")(collectively "PC Defendants"), and several non-physician laypersons, including, Dmitry Tvildiani a/k/a Dmitry Tvildiana ("Tvildiani"), Iberia Management, LLC ("Iberia") and Medeq International, LLC ("Medeq") who secretly and unlawfully owned and controlled the medical professional corporations.

2.     In addition to seeking recovery of the stolen monies, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,900,000.00 in pending no-fault insurance claims that were submitted to GEICO by the Defendants under the names of AMD and Springfield Imaging, for radiology services (i.e., X-ray studies, CT-scans, and magnetic resonance imaging ("MRI") studies) (collectively, the "Radiology Services").

3.     As set forth in more detail below, GEICO is entitled to judgment in this action because:

    (i)     the PC Defendants are fraudulently incorporated, unlawfully owned and controlled by non-physicians and, therefore, ineligible to bill for or to collect no-fault benefits;

    (ii)     the PC Defendants unlawfully split fees with non-physicians and/or engaged in kickback arrangements and, therefore, are ineligible to bill for or to collect no-fault benefits;

    (iii)     AMD was a radiology practice owned "on paper" by a physician who does not practice radiology, who never engaged in the practice of medicine through AMD and, therefore, was never eligible to recover No-Fault benefits; and

    (iv)     the Radiology Services, in many cases, were provided by independent contractors, rather than by the PC Defendants' employees.

4.     The Defendants fall into the following categories:

    (i)     The PC Defendants are fraudulently incorporated New York professional corporations, through which the Radiology Services purportedly were performed and billed to insurance companies, including GEICO.

    (ii)     Dr. Mikhelashvili is a licensed physician who falsely purported to own AMD;

    (iii)     Dr. Khodadadi is a licensed physician who falsely purported to own Springfield Imaging.

    (iv)     Tvildiani, Iberia and Medeq along with John Doe Defendants 1–10 and John Doe Corporations 1–10 (collectively the "Management Defendants"), are not and never have been licensed physicians. Even so, they secretly and unlawfully owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

(Collectively, referred to herein as the "Defendants.")

5.     The fraudulent scheme at issue herein has been essentially admitted to by Dr. Khodadadi, as he has acknowledged in interviews that he, along with the PCs operating at 68-29 Springfield Boulevard, Oakland Gardens, New York ("Springfield Boulevard location") were under Tvildiani's control.  In fact, all the Defendants in this action have already been named as

3

defendants (along with the predecessor to PC to AMD and Springfield Imaging) in a federal civil lawsuit alleging that the PCs were fraudulently incorporated, owned and controlled by Tvildiani.

6.     In his interview, Khodadadi specifically identified Tvildiani as the individual who actually owns and controls the PCs at the Springfield Boulevard location.  For example, Dr. Khodadadi confirmed the following allegations: (i) Tvildiani hired him (and previously Dr. Mikhelashvili) as "medical directors;" (ii) Tvildiani owned the physical location and the medical equipment; (iii) Tvildiani controlled the banking accounts of the PCs; (iv) Dr. Khodadadi performed services for AMD as an independent contractor; (v) Dr. Khodadadi had not received any compensation from Springfield Imaging as Tvildiani advised him the PC was operating at a loss; and (vi) Tvildiani controlled the hiring of the individuals who rendered services on behalf of the PCs.

7.     As discussed below, Defendants at all relevant times have known that (i) the PC Defendants are fraudulently incorporated, unlawfully owned and controlled by non-physicians and, therefore, ineligible to bill for or to collect no-fault benefits; (ii) the PC Defendants unlawfully split fees or engage in kickback arrangements with non-physicians and, therefore, are ineligible to bill for or to collect no-fault benefits; (iii) AMD was a radiology practice owned "on paper" by a physician who does not practice radiology, and who has never engaged in the practice of medicine through AMD and, therefore, was never eligible to recover No-Fault benefits; and (iv) in many cases, the Radiology Services are provided by independent contractors, rather than by the PC Defendants' employees.

8.     As such, the Defendants do not now have – and never had – any right to be compensated for the Radiology Services that have been billed to GEICO through the PC Defendants.  The charts attached hereto as Exhibit "1" and Exhibit "2" sets forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted,

4

or caused to be submitted, to GEICO. The Defendants' fraudulent scheme began as early as 2008 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $620,000.00.

## THE PARTIES

### I.     Plaintiffs

9.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co., are all Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.     Defendants

10.     Defendant Dr. Mikhelashvili is a physician, who has been licensed to practice medicine in New York since July 14, 2006. Dr. Mikhelashvili resides in and is a citizen of the State of New York. Dr. Mikhelashvili served as the nominal or "paper" owner of AMD.

11.     Defendant Dr. Khodadadi is a physician, who has been licensed to practice medicine in New York since August 21, 1972. Dr. Khodadadi resides in and is a citizen of the State of New York. Dr. Khodadadi served as the nominal or "paper" owner of Springfield Imaging.

12.     Defendant AMD is a fraudulently incorporated New York medical professional corporation with its principal place of business in New York, through which many of the Radiology Services have been billed to insurance companies, including GEICO. AMD was fraudulently incorporated on March 24, 2008, and nominally was owned on paper by Dr. Mikhelashvili, but in actuality always has been owned and controlled by non-physicians in contravention of New York law.

13. Defendant Springfield Imaging is a fraudulently incorporated New York medical professional corporation with its principal place of business in New York, through which many of the Radiology Services have been billed to insurance companies, including GEICO. Springfield Imaging was fraudulently incorporated on May 31, 2012, and nominally was owned on paper by Dr. Khodadadi but in actuality always has been owned and controlled by non-physicians in contravention of New York law.

14. Defendant Tvildiani resides in and is a citizen of New York. Tvildiani is not and never has been a licensed physician. Nonetheless, he has owned, controlled and derived economic benefit from the PC Defendants in contravention of New York law.

15. Defendant Iberia is a New York corporation with its principal place of business in New York. Iberia was incorporated in New York on or about June 29, 2005, and has been used to illegally own and control the PC Defendants and to siphon revenues to non-physicians. Tvildiani is the owner of Iberia.

16. Defendant Medeq is a New York corporation with its principal place of business in New York. Medeq was incorporated in New York on or about December 22, 2004, and has been used to illegally own and control the PC Defendants and to siphon revenues to non-physicians. Tvildiani is the owner of Medeq. Medeq's Department of State process address is Tvildiani's home address.

17. Upon information and belief, John Doe Defendants 1 –10 reside in and are citizens of New York. John Doe Defendants 1–10 are individuals and entities, presently not identifiable, who are not and never have been licensed as physicians, yet together with Tvildiani, Iberia and Medeq have owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

## I.     An Overview of the No-Fault Laws and Licensing Statutes

20.     GEICO underwrites automobile insurance in New York.

21.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

23.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services. Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

24.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

25.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

26.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory

exceptions not applicable in this case, derive economic benefit from professional healthcare services.

27. New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals.

28. Additionally, New York law requires that the shareholders of a medical professional corporation be engaged in the practice of medicine through the professional corporation in order for it to be lawfully licensed.

29. Therefore, under the No-Fault Laws, a medical professional corporation is not eligible to receive No-Fault Benefits if, among other things: (i) it is fraudulently incorporated; (ii) it is fraudulently licensed; (iii) it is owned by a physician who does not practice medicine through it; (iv) it engages in unlawful fee-splitting with unlicensed non-professionals; (v) or if it pays or receives unlawful kickbacks in exchange for patient referrals.

30. In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

31. Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

32.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

33.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

34.     Beginning in 2007 and continuing through the present day, the Defendants masterminded and implemented a fraudulent scheme in which the PC Defendants have been used to bill the New York automobile insurance industry millions of dollars for radiology services for which they have never been eligible for payment.  In fact, Tvildiani is no stranger to these type of schemes, having been involved as early as 2000 in various schemes to defraud insurance companies.

### A.     The Fraudulent Incorporation and Operation of Advanced Medical Diagnostic of Queens, PC

35.     While Tvildiani has a history of fraudulently incorporating professional corporations under the nominal auspices of various medical professionals, and then using them to submit large-scale fraudulent no-fault billing to automobile insurers, this specific scheme began

when Tvildiani purchased the Springfield Boulevard location (which is now co-owned with Tamar Tvildiani). Upon information and belief, Tamar Tvildiani is Dimitry's wife.

36. Tvildiani subsequently incorporated a number of corporations, which were located at the Springfield Boulevard location. These corporations are owned and controlled by Tvildiani including, but are not limited to, Iberia and Medeq. Both Iberia and Medeq have been used by Tvildiani in past fraudulent schemes as well as the fraudulent scheme involving the PC Defendants.

37. Commencing in 2007, Tvildiani then commenced a search for a licensed physician who would be willing to "sell" or "loan" the use of his medical license to him so that he could fraudulently incorporate a medical professional corporation and use it to submit large-scale fraudulent no-fault billing to insurers.

38. Toward that end, Tvildiani approached Dr. Mikhelashvili, and offered to purchase the use of his medical license so that he could fraudulently incorporate AMD and cause it to begin operating from the Springfield Boulevard location.

39. In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing AMD to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Mikhelashvili. In exchange for a designated salary or other form of compensation, in early 2008, Dr. Mikhelashvili agreed to falsely represent in the certificate of incorporation filed with the Department of Education, that he was the true shareholder, director and officer of AMD and that he truly owned, controlled and practiced through the professional corporation.

40. Once AMD was fraudulently incorporated, Dr. Mikhelashvili ceded true beneficial ownership and control over the professional corporation to the Management Defendants. Dr.

Mikhelashvili is an anesthesiologist and provided professional services on behalf of various other medical practices, none of which were AMD.

41. The Management Defendants – rather than Dr. Mikhelashvili – provided all start-up costs and investment in AMD. Dr. Mikhelashvili did not incur any costs to establish AMD's practice, nor did he invest any money in the professional corporation that he purportedly owned.

42. Dr. Mikhelashvili never was the true shareholder, director, or officer of AMD, and never had any true ownership interest in or control over the professional corporation. True ownership and control over AMD always rested entirely with the Management Defendants, who used the façade of AMD to do indirectly what they were forbidden from doing directly, namely: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

43. Dr. Mikhelashvili exercised absolutely no control over or ownership interest in AMD. All decision-making authority relating to the operation and management of AMD was vested entirely with the Management Defendants. In addition, Dr. Mikhelashvili never controlled or maintained any of AMD's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of AMD's financial affairs; never hired or supervised any of AMD's employees or independent contractors; and was completely unaware of the most fundamental aspects of how AMD operated.

44. To conceal the true ownership and control of AMD while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Dr. Mikhelashvili and AMD enter into a series of "management," "billing," "marketing," and/or "lease" agreements with themselves. These agreements called for exorbitant payments from AMD to the Management Defendants, for the alleged performance of

certain designated services including management, marketing, billing, and/or collections regardless of: (i) the volume of AMD's business; or (ii) the income generated by the professional corporation.

45.     While these agreements ostensibly were created to permit the Management Defendants to provide "management," "billing," and/or "marketing," services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own AMD; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through AMD.

46.     The net effect of these "management," "billing," "marketing," and/or "lease" agreements between Dr. Mikhelashvili, AMD, and the Management Defendants was to maintain AMD in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

47.     Tvildiani, while concealing his illegal ownership and control of AMD, purported to act as a "manager" of AMD.  As stated above Dr. Khodadadi, was interviewed and advised that (i) Tvildiani hired Dr. Mikhelashvili as "medical director" of AMD; (ii) Tvildiani owned the physical location and the medical equipment; (iii) Tvildiani controlled the banking accounts of the PCs; (iv) Khodadadi performed services for AMD as an independent contractor; and (v) Tvildiani controlled the hiring of the technicians and radiologists who rendered services on behalf of the PCs.

48.     A separate interview was conducted by the same insurer with Tvildiani.  Tvildiani admitted to being an "office manager" at the Springfield Boulevard location. Tvildiani maintains an office at the Springfield Boulevard location and he admitted that the medical PCs at the location lease equipment from a company he owns, Medeq.

49.     In fact, at the Springfield Boulevard location is a certificate from The New York City Department of Health and Mental Hygiene in the name of Tvildiani, Iberia and Dr. Allen Rothpearl, certifying that the location was registered with the City to maintain radiation producing equipment.    According to the Department of Health and Hygiene, registration for radiation producing equipment must be issued to the physicians in control of the equipment and the practice. Further, the telephone number used by AMD is directly related to Tvildiani and not AMD.

50.     The net effect of all of the arrangements between Dr. Mikhelashvili, AMD and the Management Defendants was to enable the Management Defendants to maintain total control over the professional corporation, the accounts receivable, and any revenues that might be generated therefrom.

**B.     The Fraudulent Incorporation of Springfield Radiology Imaging, PC**

51.     In addition to owning and controlling AMD, Tvildiani fraudulently formed and controlled another medical professional corporation in furtherance of their desire to avoid detection by insurers, given the volume of fraudulent billing they were submitting to New York insurance companies under the Springfield Radiology name.

52.     Accordingly, Tvildiani decided to form a new professional corporation under a new tax identification number that would effectively replace AMD. To that end, Tvildiani recruited a new physician to sell or loan his license to them in order to fraudulently incorporated AMD. Tvildiani did not have to look any further than an individual he had hired to read imaging studies on behalf of AMD.   Tvildiani approached Dr. Khodadadi and offered to purchase the use of his medical license so that they could fraudulently incorporate Springfield Imaging and cause it to commence operating from the Springfield Boulevard location, as he began to wind down AMD.

53.     As with AMD, in order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Springfield Imaging to operate

14

a medical practice, the Management Defendants falsely represented in the certificate of incorporation filed with the Department of Education, that Dr. Khodadadi was the true shareholder, director and officer of Springfield Imaging and that he truly owned and controlled the professional corporation.

54.     As with AMD, once Springfield Imaging was fraudulently incorporated on or about May 31, 2012, true beneficial ownership and control over the professional corporation was ceded to the Management Defendants.

55.     As with AMD, the Management Defendants – rather than Dr. Khodadadi– provided all start-up costs and investment in Springfield Imaging.  In fact, Dr. Khodadadi did not incur any costs to establish Springfield Imaging's practice, nor did he invest any money in the professional corporation he purportedly owned.

56.     Dr. Khodadadi never was the true shareholder, director, or officer of Springfield Imaging, and never had any true ownership interest in or control over the professional corporation. True ownership and control Springfield Imaging always rested entirely the Management Defendants, who used the façade of Springfield Imaging to do indirectly what they were forbidden from doing directly, namely: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

57.     Dr. Khodadadi exercised absolutely no control over or ownership interest in Springfield Imaging. All decision-making authority relating to the operation and management of Springfield Imaging was vested entirely with the Management Defendants. In addition, Dr. Khodadadi never controlled or maintained any of Springfield Imaging's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Springfield Imaging's financial affairs; never hired

or supervised any of Springfield Imaging's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Springfield Imaging operated.

58. To conceal their true ownership and control of Springfield Imaging while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Dr. Khodadadi and Springfield Imaging enter into a series of "management," "billing," "marketing," and/or "lease" agreements with themselves. These agreements called for exorbitant payments from Springfield Imaging to the Management Defendants, for the alleged performance of certain designated services including management, marketing, billing, and/or collections regardless of: (i) the volume of Springfield Imaging's business; or (ii) the income generated by the professional corporation.

59. While these agreements ostensibly were created to permit the Management Defendants to provide "management," "billing," and/or "marketing," services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Springfield Imaging; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Springfield Imaging.

60. The net effect of these "management," "billing," "marketing," and/or "lease" agreements between Dr. Khodadadi, Springfield Imaging, and the Management Defendants was to maintain Springfield Imaging in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

61. In fact, other than the nominal change in name and owner, absolutely nothing changed during the transition from AMD to Springfield Imaging. For example, when the Management Defendants caused Springfield Imaging to begin operating they maintained the same:

16

(i) location; (ii) phone number; (iii) medical and non-medical employees; (iv) medical and non-medical equipment; (v) lease agreements; and (vi) referral sources, as existed with AMD.

62.     As noted above, GEICO became aware of interviews given by Dr. Khodadadi. During these interviews, Dr. Khodadadi advised that:

- Tvildiani hired him as an independent contractor to act as a reading radiologist for AMD;

- Upon forming Springfield Imaging, Tvildiani hired him as the "Medical Director";

- Tvildiani owned the Springfield Boulevard location and the medical equipment used by Springfield Imaging (and previously AMD);

- Tvildiani controlled the hiring of the technicians and radiologists who rendered services on behalf of Springfield Imaging;

- Tvildiani had not been compensated for his role as "Medical Director" of Springfield Imaging because Tvildiani told him the PC was operating at a deficit

- Dr. Khodadadi did not know the names of any of the individuals rendering services on behalf of Springfield Imaging.

63.     Further, Dr. Khodadadi, like Dr. Mikhelashvili, does not actual spend time at the Springfield Boulevard location.   On a regular basis Dr. Khodadadi provides services for numerous other medical providers located across New York City.   Further, the telephone number used by Springfield Imaging is directly related to Tvildiani and not Springfield Imaging.

64.     By his own admissions, it is clear that Springfield Imaging is actually owned and controlled, not by Dr. Khodadadi, but by Tvildiani.   Clearly, all decision making and financial components of the PC are controlled by Tvildiani.

65.     The Management Defendants' handling of the billing and claims submissions allow him to conceal the identity of the individuals rendering services on behalf of Springfield Imaging and maintain total control over the professional corporation, the accounts receivable, and any

revenues that might be generated therefrom. What has been created is a turn-key facility operating out of the Springfield Boulevard location, in which the Management Defendants could continue to recruit and use physicians' licenses in order to create the façade of legally incorporated PCs. The PCs, including Springfield Imaging, were used as vehicles by which the Management Defendants unlawfully split-fees and funneled large sums of money to themselves in contravention of New York law. This scheme not only unlawfully enriched the Management Defendants, but compromised patient care as the PCs' operations are subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of true doctor-owners.

C.     The Fraudulent Billing for Services Provided by Independent Contractors

66.     The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

67.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or

herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act..."); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "3").

68.    With respect to the PC Defendants, the Management Defendants used certain radiologists that they knew would be amenable to the scheme, including Dr. Khodadadi, who provided services on behalf of AMD prior to becoming the "Medical Director" of Springfield Imaging.    Additionally, the reading radiologists' services were not exclusive to the PC Defendants.    Rather, each of the reading radiologists, including nominal owner of Springfield Imaging, Dr. Khodadadi, has purported to provide services at numerous other facilities while concurrently performing services for the PC Defendants.

69.    As outlined above, Dr. Khodadadi admitted during an interview that he was compensated for his services as a reading radiologist for AMD as an independent contractor. Further, Dr. Khodadadi admitted that Tvildiani hired the technicians who performed the services and who were paid as independent contractors.    Additionally, Dr. Khodadadi stated that while rendering services as a reading radiologist for AMD, he did not even recognize the name of the alleged owner, Dr. Mikhelashvili.

70.    The Management Defendants have, at all times, treated the reading radiologists and the technicians who performed the Radiology Services, as independent contractors, rather than as employees of the PC Defendant.

71.    For instance, the Management Defendants:

(i)     paid the reading radiologists and unlicensed technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the reading radiologists and unlicensed technicians that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the reading radiologists and unlicensed technicians;

(iv)    failed to secure and maintain W-4 or I-9 forms for the reading radiologists and unlicensed technicians;

(v)     failed to withhold federal, state or city taxes on behalf of the reading radiologists and unlicensed technicians;

(vi)    compelled the reading radiologists and unlicensed technicians to pay for their own malpractice insurance at their own expense;

(vii)   permitted the reading radiologists and unlicensed technicians to set their own schedules and days on which they desired to perform services;

(viii)  permitted the reading radiologists and unlicensed technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices; and

(ix)    failed to cover the reading radiologists and unlicensed technicians for either unemployment or workers' compensation benefits.

72.     By electing to treat the reading radiologists and technicians as independent contractors, the Defendants realize significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)   avoiding claims of agency-based liability arising from work performed by the reading radiologists and technicians.

73.    Because the reading radiologists and technicians are independent contractors and performed the Radiology Services, the Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

74.    The Defendants billed for the Radiology Services as if they were provided by actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**D.    Dr. Mikhelashvili's Failure to Practice Medicine Through Advanced Diagnostic Medical of Queens, PC**

75.    During the time that Dr. Mikhelashvili has been listed as the record owner of AMD, Dr. Mikhelashvili has been working full time as an anesthesiologist at various medical practices located in New York City and Nassau County.

76.    Dr. Mikhelashvili did not personally treat or provide radiology services to any patient of AMD, and did not read or interpret any MRI studies for AMD.

77.    Dr. Mikhelashvili did not supervise any of the treatment or services allegedly provided to patients of AMD.

78.    Dr. Mikhelashvili did not supervise or train any of the radiologists that allegedly interpreted the MRI studies of patients for AMD.

79.    Dr. Mikhelashvili did not review any of the bills sent out under the AMD name.

80.    Moreover, as an anesthesiologist, Dr. Mikhelashvili is not competent to either (i) interpret the MRI studies that are allegedly performed on GEICO Insureds, or (ii) supervise the interpretations of the MRI studies that are allegedly performed by the radiologists that are retained to work at AMD.

81.     Business Corporation Law §1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed.  BCL § 1507 provides as follows:

**Issuance of shares**

A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued….All shares issued, agreements made, or proxies granted in violation of this section shall be void.

82.     Legislative history confirms that the physician must not only be licensed to practice but must also be engaged in the practice of medicine in a medical professional corporation.  For example, in commenting on the proposed amendment to BCL § 1507 in 1971, the State Education Department, stated:

This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, <u>it maintains the basic concept of restricting ownership to professionals working within the corporation</u>.

83.     Similarly, the New York Department of State commented that:

Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice <u>and who so practice in such corporation or a predecessor entity</u>.

The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

84.     New York's Department of Health was of the same opinion, commenting that:

The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations <u>to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged</u>…. (Emphasis added.)

(Copies of the memoranda referenced in ¶¶ 32-35 above are collectively annexed to this Complaint as Exhibit "4.")

85.     Dr. Mikhelashvili's failure to practice medicine through the professional corporation as well as his failure and/or inability to supervise any of the radiologists who perform the services compromises patient care and results in unnecessary testing.

## II.     The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

86.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms and/or treatment reports through the PC Defendant to GEICO seeking payment for the Radiology Services for which the Defendants were not entitled to receive payment.

87.     The NF-3 forms and treatment reports that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)     The NF-3 forms and treatment reports uniformly misrepresented to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not properly licensed in that it is a medical professional corporation that is fraudulently incorporated, unlawfully owned and controlled by unlicensed non-physicians.

(ii)    The NF-3 forms and treatment reports uniformly misrepresented to GEICO that the PC Defendants are in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not in compliance with all material licensing laws in that engages in unlawful fee-splitting and/or kickback arrangements with unlicensed non-physicians.

(iii)   The NF-3 forms and treatment reports uniformly misrepresented to GEICO that the PC Defendant is eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the Radiology Services. In fact, the PC Defendants are not eligible to seek or pursue collection of No-Fault Benefits for the Radiology Services because the Radiology Services are not provided by the PC Defendants' employees.

(iv) The NF-3 forms uniformly misrepresented to GEICO that AMD was lawfully licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, AMD was not properly licensed in that it is a medical professional corporation that is owned by a physician that did not actually practice medicine through the professional corporation and was not capable of doing so.

## III.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

88.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

89.    To induce GEICO to promptly pay the fraudulent charges for the Radiology Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

90.    Specifically, they knowingly misrepresented and concealed facts related to the PC Defendant in an effort to prevent discovery that the PC Defendants were fraudulently incorporated, unlawfully split fees and/or engaged in kickback arrangements with unlicensed persons.

91.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the PC Defendants were fraudulently incorporated, unlawfully split fees and/or engaged in kickback arrangements with unlicensed persons.

92.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Radiology Services were performed pursuant to layperson control and their pecuniary interest.

93.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the Treating Defendants and technicians associated with PC

Defendants in order to prevent GEICO from discovering that the reading radiologists and technicians performing the Radiology Services were not employed by PC Defendants.

94.     In addition, the Defendants knowingly misrepresented and concealed facts related to the fact AMD was properly licensed even though it was owned by a physician that did not actually practice medicine through the professional corporation.

95.     Once GEICO began to suspect that PC Defendant was engaged in fraudulent operations and billing, GEICO requested that it submit additional verification including, but not limited to, examinations under oath to determine whether the charges submitted through the PC Defendant were legitimate and whether the PC was eligible to be reimbursed. Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

96.     GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

97.     In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the PC Defendant; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the PC Defendant (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

98.     The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

99.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $620,000.00 based upon the fraudulent charges.

100.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against the All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

101.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 100 above.

102.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $1,900,000.00 in fraudulent billing for Radiology Services that has been submitted to GEICO.

103.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because they are fraudulently incorporated, owned, and controlled by the Management Defendants, who are not licensed physicians, and, therefore, ineligible to bill for or to collect no-fault benefits.

104.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Radiology Services are provided by independent contractors, rather than by the PC Defendant's employees.

105.   AMD has no right to receive payment for any pending bills submitted to GEICO because AMD is owned "on paper" by an anesthesiologist who has never engaged in the practice of medicine through the professional corporation and, therefore, ineligible to seek or recover No-Fault benefits.

106.   The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because it unlawfully splits fees and/or engages in kickback arrangements with unlicensed individuals and entities and, therefore, is ineligible to bill for or to collect no-fault benefits.

107.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because:

(i)     the PC Defendants are fraudulently incorporated, owned, and controlled by unlicensed individuals and entities and, therefore, ineligible to bill for or to collect no-fault benefits;

(ii)    the Radiology Services are provided by independent contractors, rather than by the PC Defendants' employees;

(iii)   the PC Defendants unlawfully splits fees and/or engages in kickback arrangements with Defendants and other unlicensed individuals and entities and, therefore, is ineligible to bill for or to collect no-fault benefits; and

(iv)    AMD is owned on paper by a physician who has never engaged in the practice of medicine through the professional corporation, thus rendering AMD ineligible to seek or recover No-Fault benefits.

**SECOND CAUSE OF ACTION**
**Against Dr. Mikhelashvili and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

108.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 107 above.

109.    AMD is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

110.    Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of AMD's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for over five years seeking payments that AMD was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-physicians; (ii) it engages in fee-splitting and/or kickback arrangements with non-physicians; (iii) the billed-for services are performed by independent contractors, rather than by AMD employees; and (iv) AMD is owned on paper by a physician who never engaged in the practice of medicine through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

111.    AMD's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 operated AMD, insofar as AMD never was eligible to bill for or

collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for AMD to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to bill for service and attempt collection on the fraudulent billing submitted through AMD to the present day.

112.    AMD is engaged in inherently unlawful acts, inasmuch as its very corporate existence was an unlawful act, considering that it was fraudulently incorporated, owned and controlled by non-physicians while designating a physician as the nominal owner, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. These inherently unlawful acts are taken by AMD in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

113.    GEICO was injured in its business and property by reason of the above-described conduct in that it paid at least $547,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through AMD.

114.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Dr. Mikhelashvili and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

115.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 114 above.

116.    AMD is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

117.   Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, are employed by and/or associated with the AMD enterprise.

118.   Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of AMD's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for over five years seeking payments that AMD was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-physicians; (ii) it engages in fee-splitting and/or kickback arrangements with non-physicians; (iii) the billed-for services are performed by independent contractors, rather than by AMD employees; and (iv) AMD is owned on paper by a physician who never engaged in the practice of medicine through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1." Each such mailing was made in furtherance of the mail fraud scheme.

119.   Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

120.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $547,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through AMD.

121.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against AMD, Dr. Mikhelashvili and the Management Defendants**
**(Common Law Fraud)**

122.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 121 above.

123.    AMD, Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Radiology Services.

124.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that AMD was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by non-physicians; (ii) in every claim, the representation that AMD was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation is not properly licensed in that it engages in illegal fee-splitting and/or kickback arrangements with non-physicians; (iii) in every claim, the representation that the billed-for services are performed by AMD's employees, when in fact the billed-for services are performed by independent contractors; and (iv) (i) in every claim, the representation that AMD is properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11

N.Y.C.R.R. § 65-3.16(a)(12), when in fact it is owned on paper by a physician who never engaged in the practice of medicine through the professional corporation.

125. AMD, Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the PC Defendants that were not compensable under the No-Fault Laws.

126. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $547,000.00 pursuant to the fraudulent bills AMD, Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 submitted or caused to be submitted through AMD.

127. AMD, Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

128. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against AMD, Dr. Mikhelashvili and the Management Defendants
(Unjust Enrichment)**

129. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 128 above.

130. As set forth above, AMD, Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

131. When GEICO paid the bills and charges submitted by or on behalf of AMD for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10's improper, unlawful, and/or unjust acts.

132. AMD, Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

133. AMD, Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

134. By reason of the above, AMD, Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 have been unjustly enriched in an amount to be determined at trial, but in no event less than $547,000.00.

### SIXTH CAUSE OF ACTION
#### Against Dr. Khodadadi and the Management Defendants
#### (Violation of RICO, 18 U.S.C. § 1962(c))

135. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 134 above.

136. Springfield Imaging is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

137. Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Springfield Imaging's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the

United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over two years seeking payments that Springfield Imaging was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-physicians; (ii) it engages in fee-splitting and/or kickback arrangements with non-physicians; and (iii) the billed-for services are performed by independent contractors, rather than by Springfield Imaging employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

138.    Springfield Imaging's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 operated Springfield Imaging, insofar as Springfield Imaging never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Springfield Imaging to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to bill for service and attempt collection on the fraudulent billing submitted through Springfield Imaging to the present day.

139.    Springfield Imaging is engaged in inherently unlawful acts, inasmuch as its very corporate existence was an unlawful act, considering that it was fraudulently incorporated, owned and controlled by non-physicians while designating a physician as the nominal owner, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. These inherently unlawful

34

acts are taken by Springfield Imaging in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

140.     GEICO was injured in its business and property by reason of the above-described conduct in that it paid at least $72,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through Springfield Imaging.

141.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Dr. Khodadadi and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

142.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 141 above.

143.     Springfield Imaging is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

144.     Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 are employed by and/or associated with the Springfield Imaging enterprise.

145.     Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Springfield Imaging's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years seeking payments that Springfield Imaging was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully

incorporated and owned and controlled by non-physicians; (ii) it engages in fee-splitting and/or kickback arrangements with non-physicians; and (iii) the billed-for services are performed by independent contractors, rather than by Springfield Imaging employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2." Each such mailing was made in furtherance of the mail fraud scheme.

146.    Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

147.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $72,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through Springfield Imaging.

148.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
**Against Springfield Imaging, Dr. Khodadadi and the Management Defendants**
**(Common Law Fraud)**

149.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 148 above.

150.    Springfield Imaging, Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO

in the course of their submission of thousands of fraudulent bills seeking payment for the Radiology Services.

151.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Springfield Imaging was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Springfield Imaging was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation is not properly licensed in that it engages in illegal fee-splitting and/or kickback arrangements with non-physicians; and (iii) in every claim, the representation that the billed-for services are performed by Springfield Imaging's employees, when in fact the billed-for services are performed by independent contractors.

152.    Springfield Imaging, Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Springfield Imaging that were not compensable under the No-Fault Laws.

153.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $72,000.00 pursuant to the fraudulent bills Springfield Imaging, Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 submitted or caused to be submitted through Springfield Imaging.

154.     Springfield Imaging, Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

155.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Springfield Imaging, Dr. Khodadadi and the Management Defendants**
**(Unjust Enrichment)**

156.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 155 above.

157.     As set forth above, Springfield Imaging, Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

158.     When GEICO paid the bills and charges submitted by or on behalf of Springfield Imaging for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10's improper, unlawful, and/or unjust acts.

159.     Springfield Imaging, Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

160.     Springfield Imaging, Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

161.     By reason of the above, Springfield Imaging, Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10 have been unjustly enriched in an amount to be determined at trial, but in no event less than $72,000.00.

## JURY DEMAND

162.     Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co., demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.     On the First Cause of Action against the PC Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $547,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $650,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against AMD, Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, more than $547,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

E. On the Fifth Cause of Action against AMD, Dr. Mikhelashvili, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, more than $547,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper.

F. On the Sixth Cause of Action against Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $72,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G. On the Seventh Cause of Action against Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $72,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H. On the Eight Cause of Action against Springfield Imaging, Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, more than $72,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

I.    On the Ninth Cause of Action against Springfield Imaging, Dr. Khodadadi, Tvildiani, Iberia, Medeq, John Doe Corporations 1 – 10 and John Doe Defendants 1 – 10, more than $72,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:    Uniondale, New York
          March 3, 2014

RIVKIN RADLER LLP

By:_____
          Barry I. Levy (BL 2190)
          Michael A. Sirignano (MS 5263)
          Ryan Goldberg (RG 7570)
    926 RXR Plaza
    Uniondale, New York 11556-0926
    Telephone:    (516) 357-3000
    Facsimile:    (516) 357-3333

*Counsel for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*